UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:19-CV-00014-GNS-LLK

MAKER'S MARK DISTILLERY, PBC                                                   PLAINTIFF

v.

SPALDING GROUP, INC.
d/b/a ENGLISH EMPRISE;
TED'S CIGARS; and
THEODORE JACKSON, JR.                                                          DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motion to Exclude Certain Testimony and Opinions of Dr. Ran Kivetz (DN 135), Plaintiff's Motion to Exclude Certain Expert Testimony of Hal Poret (DN 136), Defendants' Motion to Exclude Certain Opinions and Testimony of Michael A. Einhorn (DN 137), Defendant's Motion for Leave to File Under Seal (DN 138), and Plaintiff's Motion for Leave to File Under Seal (DN 155).  The motions have been fully briefed and are ripe for adjudication.

     **I.**     **STATEMENT OF FACTS AND CLAIMS**

On May 1, 1997, Plaintiff Maker's Mark Distillery, PBC ("Maker's Mark") entered into a Licensing Agreement (the "1997 Agreement") with Defendant Spalding Group d/b/a English Emprise and Ted's Cigars (jointly "Spalding Group") and Defendant Theodore Jackson Jr. ("Jackson"), Spalding Group's owner and director, (collectively "Defendants"). (Compl. ¶ 41, DN 1).  The 1997 Agreement granted Spalding Group an exclusive license to use Maker's Mark's trademarks to create and sell cigars seasoned with Maker's Mark bourbon (the "Licensed Cigars"). (Compl. ¶ 41).  The licensing agreement was renewed as amended in 2003 and renewed again as amended in 2010 (the "2010 Agreement").  (Compl. ¶¶ 42-43).  On December 4, 2013, Maker's

Mark notified Defendants that it was terminating the license under the 2010 Agreement's terms, effective December 31, 2015. (Compl. ¶ 49). Under the 2010 Agreement, Spalding Group then had until June 28, 2016, to dispose of its remaining inventory of Licensed Cigars. (Compl. ¶ 51).

Following the termination of the license, Spalding Group began selling a cigar also seasoned with Maker's Mark bourbon (the "Bourbon Cigar"). (Compl. ¶ 52). Maker's Mark alleges the packaging of the Bourbon Cigar was intentionally designed to "evoke an association by customers between [t]he Bourbon Cigar on the one hand and Maker's Mark and the prior Licensed Cigars on the other." (Compl. ¶ 52). Maker's Mark further claims Spalding Group advertised the Bourbon Cigar in a variety of ways to associate it with Maker's Mark and the Licensed Cigars, despite Maker's Mark's demand that Spalding Group cease and desist. (Compl. ¶¶ 55-66). Maker's Mark brought this action against Defendants, asserting claims of trademark infringement (Count I); false designations, descriptions, and representations (Count II); and trademark dilution (Count III), in violation of the Lanham Act. 15 U.S.C. §§ 1114, 1125(a), 1125(c); (Compl. ¶¶ 88-110). It also brought breach of contract (Count IV), trademark infringement (Count V), and false designation and unfair competition (Count VI) claims under Kentucky common law. (Compl. ¶¶ 111-30). Defendants filed a counterclaim alleging various state law claims related to the licensing agreement and seeking to cancel some of Maker's Mark's trademark registrations. (Answer & Am. Countercl. 75, 79, DN 21).

## II.     JURISDICTION

The Court exercises subject matter jurisdiction over this action through federal question jurisdiction and supplemental jurisdiction over the state law claims. 28 U.S.C. §§ 1331, 1367(a).

## III.    STANDARD OF REVIEW

Fed. R. Evid. 702, which governs the admissibility of expert witnesses, states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court described judges as having a "gatekeeping role" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id*. at 589, 597. A court's object, however, "is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008) (citation omitted). "[R]ejection of expert testimony is the exception, rather than the rule . . . ." *Id.* at 530 (citation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

## IV.    DISCUSSION

### A.    Motions to Exclude Kivetz (DN 135) and Poret (DN 136)

To support its trademark infringement claims, Maker's Mark retained Dr. Ran Kivetz ("Dr. Kivetz"), a professor at Columbia University Business School with experience in consumer psychology and surveys, to conduct a survey to estimate the likelihood that consumers would mistake the Bourbon Cigars for a Maker's Mark product. (Kivetz Report ¶¶ 1-2, 4, DN 153-1). To rebut Maker's Mark's trademark dilution claims, Defendants retained Hal Poret ("Poret"), a public opinion researcher with a master's degree in mathematics and a law degree from Harvard

3

Law School, to conduct surveys to evaluate whether the words "Marker's Mark" and the red wax design are famous. (Poret Report, 4, 13-14, DN 95-4). Defendants later asked Poret to review Dr. Kivetz's likelihood-of-confusion survey and conduct his own. (Poret Report, 5, 10). Neither party challenges the qualifications of the other's expert; they each argue that the opposing party's expert's likelihood-of-confusion surveys are unreliable. (*See* Defs.' Kivetz Mem. 13; Pl.'s Poret Mem. 1-3). Because the challenges are similar, the motions will be addressed together.

Excluding surveys under *Daubert* may be appropriate "'if the person who designed the survey does not qualify as an expert' or '[i]f the survey was so informally designed and conducted that it fails key tests of professionalism and reliability.'" *Deere & Co. v. FIMCO Inc.*, 239 F. Supp. 3d 964, 977 (W.D. Ky. 2017) (alteration in original) (quoting 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:158 (5th ed. 2023)); *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 779 (W.D. Mich. 2006), *aff'd*, 502 F.3d 504 (6th Cir. 2007) ("If the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial." (citations omitted)). "Because almost all surveys are subject to some sort of criticism," however, "courts generally hold that flaws in survey methodology go to the evidentiary weight of the survey rather than its admissibility." *Leelanau Wine Cellars, Ltd.*, 452 F. Supp. 2d at 778 (citations omitted).

### 1.   *Kivetz's Likelihood-of-Confusion Survey and Poret's Rebuttal Survey*

Dr. Kivetz's survey was divided into a test group and a control group. The test group participants saw three-dimensional, 360-degree viewable graphics of Defendants' Bourbon Cigars, first the box, then an individual cigar. (Kivetz Report ¶¶ 29, 32, 43, 49). The control group participants saw three-dimensional, 360-degree viewable graphics of the box, then an individual

cigar, all with the words "Seasoned with Maker's Mark" on the cigar band replaced with "Seasoned with Bourbon" and the red wax-dipped caps replaced with red plastic caps. (Kivetz Report ¶¶ 30, 32). Participants could manipulate the images until they were ready, then they proceeded to answer question sets about the product's source, affiliation, and sponsorship. (Kivetz Report ¶¶ 44, 54). The first question set was on the product's source and was open-ended, with participants instructed to write what company they think made the product in a text box below the question (the "source question"), followed by other open-ended questions asking participants to explain their answers. (Kivetz Report ¶ 56). At the beginning of the survey, participants read instructions not to guess and that "don't know" was an acceptable answer that they could select or type. (Kivetz Report ¶ 41). The other questions asked participants to name companies, products, or brands that the participants thought were affiliated with or sponsored the cigars. (Kivetz Report ¶¶ 62-64, 66-69). Each of those questions had an explicit "don't know" option, except the open-ended questions asking participants to explain their answers if they provided one. (Kivetz Report ¶¶ 62-64, 66-69). Throughout the survey, an image of the single cigar, either the test or control version depending on the group, remained on the page for participants to view. (Kivetz Report ¶¶ 56, 62, 66). This image was of the front of the cigar, was not rotatable, and displayed only half of the cigar band, with the test group cigar displaying the words "Seasoned" and "Maker's," while "with" and "Mark" on the band and the "ted's" on the red seal were cut off. (Kivetz Report ¶¶ 54, 111).

      Poret conducted likelihood-of-confusion surveys intended to rebut Dr. Kivetz's survey, and it replicated it in all but three ways. (Poret Report 58). First, the participants could view the images, which Poret took from Dr. Kivetz's report, from several angles of the side, top, and bottom, but not a 360-degree view. (Poret Report 58-65). Second, Poret removed the image of the single

5

cigar from the question pages. (Poret Report 65). Third, Poret provided an express "don't know" option to the otherwise open-ended source question. (Poret Report 65, 67).

### a. Use of Images in the Surveys

The primary basis for each party's motion to exclude is how the opposing party's expert used images in his likelihood-of-confusion survey and whether it accurately simulated marketplace conditions. Defendants contend that Dr. Kivetz's survey created demand effects, or suggested a "correct" answer to the participants, by leaving an image of the single cigar for participants to view as they answered questions. (Defs.' Mem. Supp. Mot. Exclude Kivetz 13, 16, DN 135-1 [hereinafter Defs.' Kivetz Mem.]). According to Defendants, repeatedly showing participants the single cigar turned the survey into a "reading test," where they would answer based on the words "Seasoned" and "Maker's" visible in the repeated image instead of the Ted's Cigars branding they saw on the cigar box or the branding that was not visible on the single cigar because of the angle. (Defs.' Kivetz Mem. 16-17; Defs.' Reply Mot. Exclude Kivetz 12, DN 159 [hereinafter Defs.' Kivetz Reply]).

Maker's Mark responds that Poret's first likelihood-of-confusion survey is an unreliable "memory test" where participants were not continually exposed to the product while they evaluated it like they would have been in the marketplace. (Pl.'s Mem. Supp. Mot. Exclude Poret 14-15, DN 136-1 [hereinafter Pl.'s Poret Mem.]).[1] Maker's Mark further contends that the memory test was

---

[1] Maker's Mark first argues that Poret's first likelihood-of-confusion survey is not probative of any issue and should be excluded as irrelevant because it was just intended to test purportedly nonexistent flaws in Kivetz's survey, which it did not replicate exactly. (Pl.'s Poret Mem. 12). Poret's survey is both relevant to the factfinder's evaluation of Kivetz's survey and to the issue of likelihood of confusion. *See Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 723 (E.D. Mich. 2015) (concluding that although an expert was retained to rebut another's opinion on an issue later dismissed, the expert's testimony was still relevant to a different issue that relied on similar facts).

based on blurry images from limited angles that did not show "Maker's Mark," so it is fatally flawed and requires exclusion. (Pl.'s Poret Mem. 16-18).

These challenges amount to little more than professional disagreement about methodology, which goes to the weight and not to admissibility of the surveys. *Leelanau Wine Cellars, Ltd.*, 452 F. Supp. 2d at 778. Neither Maker's Mark nor Defendants cite to any authority suggesting either method is uniformly unreliable. (*See* Defs.' Kivetz Mem. 16-19; Pl.'s Poret Mem. 12-15). Indeed, each cites articles supporting its expert's method, which indicates that the disagreement exists within the field and the choice is within the expert's discretion. (*See* Pl.'s Resp. Defs.' Mot. Exclude Kivetz 15-21, DN 153 [hereinafter Pl.'s Kivetz Resp.]; Defs.' Kivetz Mem. 18-20). Maker's Mark cites Jerre B. Swann, a trademark survey expert who opines that a reading test and not a memory test is appropriate "where consumers make involved, deliberate, thoughtful decisions[,]" but Swann notes at the outset that the authority about which is preferable "appears to be equally divided." Jerre B. Swann, *A "Reading" Test or A "Memory" Test: Which Survey Methodology Is Corrrect?*, 95 Trademark Rep. 876, 876-77, 880 (2005). Defendants cite Henry D. Ostberg, another survey expert, who asserts that a memory test is best regardless of the product and level of consideration it requires, but he also notes that "[c]ourts have approved and disapproved of both reading and memory tests." Henry D. Ostberg, *Response to the Article Entitled, a Reading Test or a Memory Test: Which Survey Methodology Is Correct*, 95 Trademark Rep. 1446, 1446-47, 1449 (2005) (internal footnotes omitted). This methodological disagreement does not warrant exclusion of either survey.[2] *In-N-Out Burgers v. Doll n' Burgers LLC*, No. 20-

---

[2] Neither does differing results. (*See* Defs.' Kivetz Mem. 20-22; Defs.' Kivetz Reply 5-7; Pl.'s Poret Mem. 19). "It is notoriously easy for one survey expert to appear to tear apart the methodology of a survey taken by another. . . . The proper approach is to . . . use any technical defects only to lessen evidentiary weight, not to reject the results out-of-hand." McCarthy, *supra*, § 32.178 (footnotes omitted); *see also* Fed. R. Evid. 702 advisory committee's note to 2000

11911, 2022 WL 791924, at *13, *30 (E.D. Mich. Mar. 14, 2022) (admitting a survey despite concerns about whether a memory test or a reading test was more appropriate and noting that the choice is typically left to the expert (citations omitted)).

Further, the parties' more specific concerns about the images appear unfounded. Defendants argue that 33% of Kivetz's respondents wrote that "Seasoned Maker's" produced the cigar because it was all that was visible on the individual cigar image, which shows that Kivetz's survey inflates the level of confusion. (Defs.' Kivetz Mem. 22). Kivetz, however, did not include the "Seasoned Maker's" responses as evidence of confusion in his calculations. (Kivetz Report ¶¶ 111-12). Maker's Mark argues that because Poret's survey did not use 360-degree viewable images, participants could not see the words "Maker's Mark," but participants could rotate the individual cigar and see "Maker's" in one image then "er's Mark" in the next. (Pl.'s Poret Mem. 6-7; Poret Report 62). Defendants similarly assert that Kivetz's survey was flawed because no Ted's Cigars branding was visible in the single cigar image which remained on the page during the survey, but Maker's Mark's name was not visible on the cigar either, only "Seasoned" and "Maker's". (Defs.' Kivetz Reply 11-12). Moreover, before entering the question portion, participants examined the cigar box and single cigar from 360 degrees for at least 30 seconds each until indicating that they could clearly see the images. (Kivetz Report 46-49). Respondents who could not clearly see the image were removed from the survey. (Kivetz Report 48). Accordingly, none of these concerns warrant exclusion. The parties may explain to the factfinder how each expert used images and whether, in their views, those images accurately replicated marketplace

---

amendments ("When a trial court, applying [Rule 702], rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable. [Rule 702] is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise." (citation omitted)).

conditions and produced accurate results. *See In-N-Out Burgers*, 2022 WL 791924, at *13; *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529-30.

b.     "Don't Know" Survey Answer Options

The parties also move to exclude the other's likelihood-of-confusion surveys based on whether the initial source question included a "don't know" answer option. Defendants contend that Kivetz's survey is unreliable because did not include a "don't know" answer option for the source question like it did for the other questions. (Defs.' Kivetz Mem. 19-20). Maker's Mark conversely argues that an explicit "don't know" option is inappropriate for an open-ended question, so Poret's survey, which had an explicit "don't know" option, artificially increased the number of participants who selected it, thus erroneously reducing the net confusion rate. (Pl.'s Poret Mem. 18-19). As above, each party cites authority supporting its expert's method of discouraging participants from guessing, and none of which suggests that one or the other method renders a survey unreliable. (*See* Defs.' Kivetz Mem. 19-20; Pl.'s Kivetz Resp. 21-23; Pl.'s Poret Mem. 18-19; Defs.' Poret Reply 16-18).

The parties cite an article by Shari S. Diamond, another survey expert, who notes that providing a "don't know" option (Poret's method) is an acceptable way to reduce guessing but that to encourage participants who have answers to give them, some researchers just instruct them at the beginning not to guess (Kivetz's method). Shari S. Diamond, *Reference Guide on Survey Research*, *in* Reference Manual on Scientific Evidence 229, 389-91 (3d ed. 2011). True, Diamond's article appears to be discussing a "don't know" option in the context of closed-ended questions, so Poret's survey may be less accurate, but his choice does not mean the entire survey was "so informally designed and conducted that it fails key tests of professionalism and reliability . . . ." *Deere & Co.*, 239 F. Supp. 3d at 977 (citation omitted). Indeed, "'technical

9

inadequacies' in a survey, 'including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010); *accord Deere & Co.*, 239 F. Supp. 3d at 977; *see also Navarro v. Procter & Gamble Co.*, No. 1:17-CV-406, 2021 WL 868586, at *13 (S.D. Ohio Mar. 8, 2021) (disregarding a potential flaw in survey design because it "might provide a promising line of attack on cross-examination, but those critiques go to the weight, not the admissibility, of [the survey].").[3] Accordingly, neither Kivetz's likelihood-of-confusion survey nor Poret's rebuttal survey will be excluded.

### 2. *Poret's Second Likelihood-of-Confusion Survey*

Poret conducted a second likelihood-of-confusion survey that tested whether the red wax seal itself and not the "Seasoned with Maker's Mark" label on the Bourbon Cigars was likely to cause confusion. (Poret Report 71-74). The second survey again replicated the Kivetz Survey with some exceptions: the images were viewable from several angles but not 360 degrees, and the control cigars and the test cigars kept the "Seasoned with Maker's Mark" band instead of a "Seasoned with Bourbon" band. (Poret Report 74). Maker's Mark contends that the survey should be excluded because controls must not be infringing and because the survey results cannot explain whether participants were confused by the band or the wax seal. (Pl.'s Poret Mem. 21).

"Surveys [that] are . . . offered without a control cell or with a fundamentally inadequate control stimulus . . . should be excluded . . . ." Jerre B. Swann, *Survey Critiques*, *in* Trademark & Deceptive Advertising Surveys: Law, Science, & Design 371, 382 (Diamond & Swann eds.,

---

[3] Because Dr. Kivetz's survey is not "severely flawed" as Defendants insist, its probative value is not substantially outweighed by any danger of unfair prejudice, and his testimony will not be excluded based on Rule 403. (*See* Defs.' Kivetz Mem. 22-23). Any arguments regarding whether either party has a right to a jury trial in this case may be raised in a separate motion. (*See* Pl.'s Kivetz Resp. 24-25; Defs.' Kivetz Reply 13-15).

10

2012). "An appropriate control or controls in a trademark survey as in any experiment, should mimic the test stimulus without including features that are the focus of the infringement claim or are part of the message that is allegedly deceptive." Shari S. Diamond, *Control Foundations: Rationales & Approaches*, *in* Trademark & Deceptive Advertising Surveys: Law, Science, & Design , 239, 255 (Diamond & Swann eds., 2012). The purpose of avoiding infringing or allegedly infringing controls is to be able to tell whether any reported confusion is the result of actual confusion or the flawed control. *Id.* at 252-53. This is especially crucial here because, as detailed above, the parties highly dispute whether the use of "Maker's Mark" on the cigar band is likely to cause confusion. Defendants do not adequately respond to this concern with Poret's survey, noting that "Maker's Mark" on the cigar band may have been non-infringing or a fair use, ignoring the facts that even an *allegedly* infringing element is problematic and that Defendants have waived the fair use defense. (Defs.' Poret Resp. 19-21; Mem. Op. & Order 9-16, DN 121). They cite only Poret's explanation that his purpose was to isolate the red wax element. (Defs.' Poret Resp. 19-21; Mem. Op. & Order 9-16). Because Defendants have not carried their burden to prove that Poret's wax confusion survey is reliable, it will be excluded. *See* Fed. R. Evid. 702.

  **B.**  **<u>Motion to Exclude Einhorn (DN 137)</u>**

Maker's Mark retained Dr. Michael A. Einhorn ("Dr. Einhorn") to calculate Defendants' profits that may be recoverable under 15 U.S.C. § 1117(a). (Einhorn Report ¶¶ 1.1, 1.4, DN 154-1). Dr. Einhorn submitted a report and two supplemental reports in which he calculated Defendants' gross revenue and deducted Defendants' costs to arrive at their net profits from the sale of the Bourbon Cigar. (Einhorn Report ¶¶ 4.1-4.2; Einhorn 1st Supp. Report ¶¶ 4.1-4.7, DN 137-2; Einhorn 2d Supp. Report ¶¶ 5.1-5.9, DN 137-3). Dr. Einhorn also calculated what royalties would have been due under the licensing agreement. (Einhorn Report ¶¶ 7.1-7.4). Defendants

move to exclude Dr. Einhorn's testimony regarding the deductions and resulting net profits calculation; they do not challenge his gross profits or royalties calculations. (Defs.' Mem. Supp. Mot. Exclude Einhorn 7, DN 137-1 [hereinafter Defs.' Einhorn Mem.]). Defendants contend that Dr. Einhorn is unqualified to calculate Defendants' deductions and that his testimony is unreliable. (Defs.' Einhorn Mem. 13, 15).

### 1. *Dr. Einhorn's Qualifications*

Defendants challenge Dr. Einhorn's qualifications because he has a Ph.D. in economics instead of education or experience in accounting and because in deposition, he agreed that he is not an expert in "cost accounting." (Defs.' Einhorn Mem. 5-6). Dr. Einhorn does not need to have an accounting degree or be an expert in "cost accounting" to be qualified to opine on Defendants' net profits in this case. Indeed, "[t]he court's investigation of qualifications should not be onerous or inordinately exacting, but rather must look to underlying competence, not labels." *Zuzula v. ABB Power T & D Co.*, 267 F. Supp. 2d 703, 713 (E.D. Mich. 2003); *see also Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 504 (S.D.N.Y. 2015) (admitting economist's "revenues, cost margins, and profits" calculations in a Lanham Act trademark case). Maker's Mark only needs an expert who meets the "'minimal qualifications' requirement—not one who could teach a graduate seminar on the subject." *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014) (quoting *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981)).

Dr. Einhorn meets this standard. He has a Ph.D. in economics from Yale University and was a professor of economics at Rutgers University and an economist of the Antitrust Division of the U.S. Department of Justice. (Einhorn Report Ex. A, at 1, DN 154-1 [hereinafter Einhorn Resume]). He has decades of experience calculating damages in intellectual property cases and has been extensively published on that topic. (Einhorn Resume 4-18, 21-24). Much of his

12

experience has been related to copyright, but trademark damages estimations are well-represented on his resume.[4] (Einhorn Resume 9-11); *see QS Wholesale, Inc. v. World Mktg., Inc.*, No. SA-CV-12-0451-DOC-RNBX, 2013 WL 12114508, at *1 (C.D. Cal. July 9, 2013) (holding that an economist was qualified to testify about reasonable royalties in a trademark case despite arguments that he had previously worked on patent infringement but not trademark infringement cases).

Defendants also argue that Dr. Einhorn is not qualified to perform the specific calculations in this case, which involves determining which of Defendants' costs should be deducted from the gross profits to reach the net profits.[5] (Defs.' Einhorn Mem. 14; Defs.' Reply Mot. Exclude Einhorn 3, DN 158 [hereinafter Defs.' Einhorn Reply]). Dr. Einhorn has been admitted to testify regarding essentially the same calculation in copyright cases. *Mont. Connection, Inc. v. Moore*, No. 3:12-CV-0824, 2015 WL 8055934, at *4 (M.D. Tenn. Dec. 4, 2015); *Satija v. Permanent Gen. Assurance Corp. of Ohio*, No. 1:13-CV-00082, 2014 WL 1664557, at *3-4 (N.D. Ohio Apr. 25, 2014); *Gray v. Perry*, No. No. 2:15-cv-05642-CAS-JCx, 2019 WL 2992007, at *19 (C.D. Cal. July 5, 2019); *compare Premier Dealer Servs., Inc. v. Allegiance Adm'rs, LLC*, No. 2:18-CV-735,

---

[4] Defendants cite page nine of Dr. Einhorn's deposition for the assertion that he "has no experience valuing trademark cases under the Lanham Act." (Defs.' Einhorn Mem. 6). Dr. Einhorn was asked if "there are any cases that involve Lanham Act Claims *that are not contained in those pages 9, 10 and 11 of your resume*[,]" to which he responded that the publicity rights cases (on page 12) may have had Lanham Act claims, but his reports *in those cases* did not address the Lanham Act. (Einhorn Dep. 9:4-25, Dec. 13, 2022, DN 137-7 (emphasis added)). Nowhere in the attached excerpt of the deposition did Dr. Einhorn say that he has never valued a trademark case under the Lanham Act, and his resume lists a series of reports and depositions on damages that he provided in federal trademark cases. (*See* Einhorn Dep. 9, 11, 12, 18, 20; Einhorn Resume 9-11).

[5] Defendants assert that Dr. Einhorn admitted that he has never calculated deductions, citing page 20 of his deposition. (Defs.' Einhorn Mem. 14; Defs.' Reply Mot. Exclude Einhorn 3, DN 158 [hereinafter Defs.' Einhorn Reply]). Dr. Einhorn, who had previously been listing which cases he had consulted on for plaintiffs, only agreed that he was not "aware of any case involving trademarks or trade secrets or trade dress, where [he] *on behalf of the defendant* tried to establish the costs that should be deducted from the revenue." (Einhorn Dep. 11:1-17, 20:13-20 (emphasis added)).

13

2022 WL 3699403, at *5 (S.D. Ohio Aug. 25, 2022), *appeal dismissed*, No. 22-3828, 2023 WL 2746106 (6th Cir. Mar. 10, 2023), *with* McCarthy, *supra*, § 30:68.

Accordingly, Dr. Einhorn is qualified to express opinions regarding Defendants' net profits.

### 2. *Reliability of Dr. Einhorn's Calculations*

Defendants contend that Dr. Einhorn's calculations are unreliable because he used the "incremental approach," while their expert used the "full absorption" approach.[6] (Defs.' Einhorn Mem. 7-10). The incremental approach subtracts only direct production costs from a defendant's gross profits, while the full absorption approach also subtracts the proportion of overhead costs attributable to the product. McCarthy, *supra*, § 30:68. While some courts have adopted one method or the other, the Sixth Circuit appears to have not. *Id.* (collecting cases); *cf. Premier Dealer Servs., Inc.*, 2022 WL 3699403, at *5 (noting, in a copyright case, that the Sixth Circuit has not endorsed either the incremental approach or the absorption approach). In a patent case, the Sixth Circuit declined to adopt a uniform rule about whether overhead costs should be deducted from profits because it depends on the facts of each case. *Schnadig Corp. v. Gaines Mfg. Co.*, 620 F.2d 1166, 1175 (6th Cir. 1980). Moreover, trademark remedies authority suggests that the incremental approach is an acceptable method. *See, e.g.*, Terence P. Ross, *Intellectual Property Law: Damages and Remedies* § 4.03[3][c] (2023) (noting that the incremental approach best serves the purposes of the Lanham Act); William Kerr & Richard Troxel, *Assets and Finances: Calculating Intellectual Property Damages* § 7:13 (2023-2024 ed.) (noting that courts have largely

---

[6] Defendants style this argument as one to exclude Dr. Einhorn's testimony as speculative, but the substance is directed at Dr. Einhorn's choice to use the incremental approach. (Defs.' Einhorn Mem. 7-10, 14-15). Indeed, Dr. Einhorn's calculations are based on Defendants' records produced in discovery. (*See* Einhorn Report ¶¶ 3.1-3.2; Einhorn Report Ex. B, at 2, DN 137-2); 15 U.S.C. § 1117(a) ("[D]efendant must prove all elements of cost or deduction claimed.").

accepted the incremental approach); Restatement (Third) of Unfair Competition § 37 (1995) (explaining the situations where the incremental approach rather than the full absorption approach is preferable); McCarthy, *supra*, § 30:68 (identifying incremental and full absorption as the primary methods of calculation). Accordingly, Dr. Einhorn's testimony will not be excluded, and Defendants can address any objections to Dr. Einhorn's methodology through cross-examination. *See Daubert*, 509 U.S. at 596 (citation omitted); Fed. R. Evid. 702 advisory committee's note to 2000 amendments.[7]

### C. Motions for Leave to Seal (DN 138, 155)

Defendants move to seal their motion to exclude Dr. Einhorn (DN 137) and the attached Exhibits 1-5,[8] and Maker's Mark moves to seal its response (DN 154) to the motion and Exhibit 1, which includes Dr. Einhorn's report and supplemental reports.[9] The documents contain Defendants' profit margins, sales data, and other financial information. (Defs.' Mot. Leave File Seal 2, DN 138).

---

[7] Defendants also argue that Dr. Einhorn's calculations are unreliable because he is not qualified to perform them, but as addressed above, that argument is not well-taken. (Defs.' Einhorn Mem. 15).

[8] Exhibit 4 (DN 137-5) is Defendants' expert's report. (Defs.' Mot. Leave File Seal 1 n.1; *see* Defs.' Mot. Exclude Einhorn Ex. 4, DN 137-5). The Court declined to seal the report (then at DN 88-4 and DN 95-5) in a previous order because the parties only noted that the document was confidential under their agreed order, which is not sufficient to overcome the presumption of public access to court records. (Mem. Op. & Order 25-28). Defendants assert that "the present Motion addresses the Court's concerns," so DN 88-4 and DN 95-5 should also be sealed, but it does not for the reasons stated below and because even the public redacted version of the report contains pages of unredacted tables of Defendants' profits and costs, so it is unclear what Defendants seek to seal and why. (Defs.' Mot. Leave File Seal 1 n.1; *see* Defs.' Mot. Exclude Einhorn Ex. 4). Accordingly, DN 88-4 and DN 95-5 will not be sealed.

[9] Maker's Mark moved to seal its response and related exhibits pending the resolution of Defendants' motion, so this section refers only to Defendants' burden to overcome the presumption in favor of public access.

15

To determine whether to seal documents, "a court must balance the litigants' privacy interests against the public's right of access, recognizing our judicial system's strong presumption in favor of openness." *Rudd Equip. Co. v. John Deere Constr. & Forestry Co.*, 834 F.3d 589, 594 (6th Cir. 2016). To overcome that presumption, the proponent must demonstrate: "(1) a compelling interest in sealing the records; (2) that the interest in sealing outweighs the public's interest in accessing the records; and (3) that the request is narrowly tailored." *Kondash v. Kia Motors Am., Inc.*, 767 F. App'x 635, 637-38 (6th Cir. 2019) (citing *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016)). In doing so, the proponent must show that "disclosure will work a clearly defined and serious injury" and "analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations." *Shane Grp., Inc.*, 825 F.3d at 305-06, 307 (quoting *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001); *Baxter Int'l, Inc. v. Abbott Lab'ys*, 297 F.3d 544, 548 (7th Cir. 2002)). Additionally, "'[i]n civil litigation, only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of a sexual assault),' is typically enough to overcome the presumption of access." *Id.* at 308 (citing *Baxter*, 297 F.3d at 546). Defendants fail to meet this high burden. They lump all the documents they seek to seal into a single argument that the financial information "would cause competitive harm to Defendants" and "would give Defendants' competitors an advantage in outbidding Defendants." (Defs.' Mot. Leave File Seal 2-3). Without more, this falls far short of the "compelling interest" or "clearly defined and serious injury" required to outweigh the public's interest, thus, the motions for leave to file under seal are denied. *See Shane Grp., Inc.*, 825 F.3d at 305-06, 307 (citations omitted).

## V. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1. Defendants' Motion to Exclude Certain Testimony and Opinions of Dr. Ran Kivetz (DN 135) is **DENIED**.

2. Plaintiff's Motion to Exclude Certain Expert Testimony of Hal Poret (DN 136) is **GRANTED IN PART** and **DENIED IN PART**.

3. Defendants' Motion to Exclude Certain Opinions and Testimony of Michael A. Einhorn (DN 137) is **DENIED**.

4. Defendants' Motion for Leave to File Under Seal (DN 138) is **DENIED**.

5. Plaintiff's Motion for Leave to File Under Seal (DN 155) is **DENIED**.

Greg N. Stivers, Chief Judge
United States District Court

March 5, 2024

cc: counsel of record